**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> KENNETH NEWCOMBE, <br><br> Defendant. | Civil Action No. 24-cv-7477 <br><br> **COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Commodity Futures Trading Commission (the "Commission"), by and through counsel, alleges as follows:

## I.  SUMMARY

1.      From at least 2019 to at least in or around December 2023 (the "Relevant Period"), Defendant Kenneth Newcombe, while Chief Executive Officer ("CEO"), founder, and majority shareholder of one of the largest voluntary carbon credit project developers (collectively with its subsidiaries, "the Project Developer"), engaged in a fraudulent scheme that involved reporting false and misleading information to at least one carbon credit registry based in the United States (the "Carbon Credit Registry"), third-party reviewers such as validation and verification bodies ("VVBs"), and others in order to present a misleading impression of the quality of the Project Developer's emissions-reduction projects, to obtain carbon credits far beyond what the company was entitled to receive, and to increase the company's revenue by millions of dollars.  Newcombe as well as other Project Developer executives, supervisors, and

1

personnel, controlled, oversaw, and participated in these efforts, and Newcombe knowingly, intentionally, or recklessly participated in, directed, and set the tone for the fraud.

2.      After the Project Developer reported the false and misleading information— information such as data relating to usage and energy savings versus the baseline scenario[1] for the Project Developer's projects—the Carbon Credit Registry publicly reported the information on its website and issued to the Project Developer millions more carbon credits than the Project Developer was entitled to receive, and which the Project Developer could and did sell to others.

3.      Through this conduct, Defendant has engaged, is engaging, or is about to engage in fraudulent or manipulative acts and practices in violation of the Commodity Exchange Act ("CEA" or "Act"), 7 U.S.C. §§ 1–26, and Commission Regulations ("Regulations"), 17 C.F.R. pts. 1–190 (2023), specifically, Sections 6(c)(1), 6(c)(1)(A), and 9(a)(2) of the Act, 7 U.S.C. §§ 9(1), 9(1)(A), 13(a)(2), and Regulation 180.1(a)(1)–(4), 17 C.F.R. § 180.1(a)(1)–(4) (2023).

4.      During the Relevant Period, while CEO and majority shareholder, Newcombe directly or indirectly controlled the Project Developer and did not act in good faith or knowingly induced, directly or indirectly, the Project Developer's violations and is thus liable as a control person for the violations of the Project Developer, its officers, employees, and agents, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

5.      During the Relevant Period, while acting as the Project Developer's CEO, Newcombe willfully aided, abetted, counseled, commanded, induced, or procured the acts constituting the violations described herein, or acted in combination or concert with any other

---

[1] "A baseline scenario is the predicted or assumed outcome in the absence of the incentives created by carbon credits, holding all other factors constant." *See* Commission Guidance Regarding the Listing of Voluntary Carbon Credit Derivative Contracts, RIN 3038-AF40, at 10 n. 39 (pre-print version, approved Sept. 19, 2024) (publication forthcoming).

person in any such violation, or willfully caused an act to be done or omitted which if directly performed or omitted by Newcombe or another would constitute a violation and thus is liable pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a), for such violations.

6.      Unless restrained and enjoined by this Court, Newcombe is likely to continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

7.      Accordingly, the CFTC brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-l, to enjoin Newcombe's unlawful acts and practices and to compel compliance with the Act.  In addition, the CFTC seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, disgorgement, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

## II.      JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345 (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  Section 6c of the CEA, 7 U.S.C. § 13a-1(a), authorizes the CFTC to seek injunctive relief against any person whenever it shall appear to the CFTC that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the CEA or any rule, regulation, or order thereunder.

9.      Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because Defendant transacted business in the Southern District of New York and acts and practices in violation of the Act and Regulations occurred in the Southern District of New York.

### III.    PARTIES

#### A.    The CFTC

10.    Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act and Regulations promulgated thereunder.

#### B.    Defendant

11.    **Kenneth Newcombe** founded the Project Developer and during the Relevant Period was its controlling shareholder and CEO.  Newcombe's last known residence was in California.  Newcombe has never been registered with the Commission in any capacity.

### IV.    STATUTORY BACKGROUND AND LEGAL FRAMEWORK

12.    The purpose of the Act is to "serve the public interests . . . through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission," as well as "to deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to [the Act] and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition among boards of trade, other markets and market participants."  Section 3 of the Act, 7 U.S.C. § 5.

13.    A carbon credit is a tradeable intangible instrument that typically is designed to represent greenhouse gas emissions reduced by, or removed from, the atmosphere equivalent to one metric ton of carbon dioxide.

14.    Carbon credits, such as those discussed herein, are encompassed in the definition of "commodity" in Section 1a(9) of the Act, 7 U.S.C. § 1a(9), and are subject to the applicable provisions of the Act and Regulations.

15.    As markets for carbon credits have evolved, futures contracts have been offered on various carbon credits by designated contract markets that are registered with the CFTC, such as the New York Mercantile Exchange, ICE Futures U.S., and Nodal Exchange.

16.    Section 6(c)(1) of the Act, 7 U.S.C. § 9, and Regulation 180.1, 17 C.F.R. § 180.1 (2023), prohibit the use or attempted use of any manipulative or deceptive device, untrue or misleading statements or omissions, or deceptive practice, in connection with any swap or contract of sale of any commodity in interstate commerce, or for future delivery.  Specifically, Regulation 180.1(a)(1)–(3) makes it:

> [U]nlawful . . . , directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly: (1) [u]se or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) [m]ake, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; (3) [e]ngage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

17.    Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2), makes it unlawful for any person

> knowingly to deliver or cause to be delivered for transmission through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce . . . .

18.    Section 6(c)(1)(A) of the Act, 7 U.S.C. § 9(1)(A), and Regulation 180.1(a)(4), 17 C.F.R. § 180.1(a)(4) (2023), similarly prohibit intentionally or recklessly, directly or indirectly, making false, misleading, or inaccurate reports concerning market information. Specifically, Regulation 180.1(a)(4) in relevant part makes it:

> unlawful . . . directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or

contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly . . . (4) [d]eliver or cause to be delivered, or attempt to deliver or cause to be delivered, for transmission through the mails or interstate commerce, by any means of communication whatsoever, a false or misleading or inaccurate report concerning . . . market information or conditions that affect or tend to affect the price of any commodity in interstate commerce, knowing, or acting in reckless disregard of the fact that such report is false, misleading or inaccurate.  Notwithstanding the foregoing, no violation of this subsection shall exist where the person mistakenly transmits, in good faith, false or misleading or inaccurate information to a price reporting service.

19.    Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2,

17 C.F.R. § 1.2 (2023), provide:

The act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person.

20.    Section 13(a) of the Act, 7 U.S.C. § 13c(a), provides:

Any person who commits, or who willfully aids, abets, counsels, commands, induces or procures the commission of, a violation of any of the provisions of [the Act], or any of the rules, regulations, or orders issued pursuant to [the Act], or who acts in combination or concert with any person in such violation, or who willfully causes an act to be done or omitted which if directly performed or omitted by him or another would be a violation of the provisions of [the Act] or any of such rules, regulations, or orders may be held responsible for such violation as a principal.

21.    Section 13(b) of the Act, 7 U.S.C. § 13c(b), provides:

Any person who, directly or indirectly, controls any person who has violated any provision of [the Act] or any of the rules, regulations, or orders issued pursuant to [the Act] may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person.  In such action, the Commission has the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation.

## V.    FACTS

### A.    Market Background

22.    Carbon credit markets include both voluntary markets not established by any government body and mandatory (or compliance) markets such as cap-and-trade programs, emissions trading systems, and allowance trading systems, which are established and regulated by national, regional, or international governmental bodies.

23.    Voluntary carbon credits ("VCCs") are carbon credits that are issued by a carbon crediting program that are designed to represent real reductions or removals of greenhouse gas emissions from the atmosphere, which market participants can trade on the voluntary carbon market and use in efforts to offset greenhouse emissions to meet emissions reductions goals.

24.    Like other carbon credits, VCCs are commodities traded in both spot and derivatives markets.

25.    The issuance of VCCs typically involves three categories of participants:  (1) the developer of a mitigation project or activity that is intended to reduce or remove greenhouse gas emissions from the atmosphere (e.g., the Project Developer); (2) a crediting program (e.g., the Carbon Credit Registry) that, among other things, issues VCCs for mitigation projects or activities that satisfy the crediting program's standards; and (3) third-party VVBs that validate and verify the mitigation project or activity.

26.    To develop a mitigation project or activity and ultimately be issued VCCs, a project developer typically first selects the crediting program with which it seeks to certify its mitigation project or activity and submits various reports to the crediting program setting forth, among other things, the technical details relating to the project and its methodology.

27.    Generally, once the crediting program determines that the mitigation project or activity satisfies the crediting program's standards for issuing VCCs based in large part on

reports the project developer submits to the crediting program, the project or activity will be certified and registered with the crediting program, and VCCs will be issued based on the amount of greenhouse-gas reductions calculated pursuant to the project's methodology.  As part of this process, a project developer typically attests to accuracy of its submissions.

28.    The crediting program typically operates or makes use of a registry, which serves as a central repository for tracking certified mitigation projects and allows market participants to issue, retire, cancel, or trade VCCs.

29.    Registries publicly report key information (based on information provided to the crediting program by the project developer and information indirectly provided by the project developer via VVBs) concerning the supply and project specifications of VCCs, thereby assisting market participants in making informed evaluations and comparisons of VCC supply and quality.

**B.    The Project Developer's Business**

30.    Founded by Newcombe in 2008, the Project Developer was incorporated in Delaware and headquartered during the Relevant Period in Washington, D.C., with employees in the United States, such as New York, New York, and in countries such as India, Malawi, Malaysia, Singapore, Cambodia, and Australia.

31.    During the Relevant Period, the Project Developer generated revenue through developing projects, such as projects implementing more efficient cookstoves (to replace less-efficient household cooking methods such as a three-stone fire), and selling VCCs resulting from those projects.

32.    During the Relevant Period, the Project Developer was one of the largest cookstove carbon project developers in the world.

33.     The Project Developer's cleaner-cookstove projects involved implementing improved cookstoves in countries in sub-Saharan Africa, Central America, and Southeast Asia (the "Cookstove Projects").

34.     In connection with the Cookstove Projects, among other roles and responsibilities, the Project Developer typically managed on-the-ground project development, implementation, and project financing.

35.     During the Relevant Period, in connection with the Cookstove Projects, the Project Developer managed the installation of millions of cookstoves purporting to be more carbon efficient than the baseline scenario.

36.     During the Relevant Period, Newcombe was CEO and majority shareholder of the Project Developer and controlled the Project Developer.

37.     As CEO and majority shareholder of the Project Developer, Newcombe oversaw the Project Developer's activities and the work of its officers, employees, and agents, including, among other ways, by e-mail, voice calls, text messages, in-person meetings, and site visits.

38.     The Project Developer's officers, employees, and agents involved in the Cookstove Projects reported directly or ultimately to Newcombe.

39.     As CEO and majority shareholder of the Project Developer, Newcombe stood to benefit from the Project Developer's increased revenues and growth, including from the sale of VCCs issued by the Carbon Credit Registry in connection with the Project Developer's projects.

40.     During the Relevant Period, Newcombe also was a member of the Board of Directors of the Carbon Credit Registry.

C.    **Carbon Credits from the Cookstove Projects**

41.    The Project Developer selected the methodology pursuant to which the Cookstove Projects would be implemented and then monitored, and pursuant to which VCCs would be assessed and quantified by the Carbon Credit Registry.

42.    Newcombe understood and was involved in selecting the methodology.

43.    The methodology included technical processes and formulas designed to quantify a given project's emissions reductions (and thus carbon credits) based on certain inputs such as numbers of more efficient cookstoves implemented and in use, and the project's efficiency versus the baseline scenario.

44.    The methodology also provided how such inputs would be obtained and measured both initially and during the project, such as through surveys of households with cookstoves that had been implemented by the Project Developer.

45.    Purportedly pursuant to the methodology, the Project Developer prepared and caused to be prepared project descriptions and validation, verification, and monitoring reports.

46.    In connection with the registration, implementation, and monitoring of the Cookstove Projects, the Project Developer reported information such as the project descriptions and validation, verification, and monitoring reports relating to the Cookstove Projects, purportedly pursuant to the selected methodology, to both the Carbon Credit Registry and to VVBs.

47.    During the Relevant Period, the Project Developer reported such information to the Carbon Credit Registry from the United States, including from New York, New York.

48.    Among these reports were the Project Developer's representations that in sum and substance the information provided was true, accurate, and materially complete, and not false, fraudulent, or misleading.

49.     During the Relevant Period, on behalf of the Project Developer, Newcombe signed certain of these representations in connection with information reported to the Carbon Credit Registry, including in connection with the Cookstove Projects.

50.     The information the Project Developer reported to the Carbon Credit Registry related to and was an important factor in the assessment and approval of the projects and the number of VCCs that the Carbon Credit Registry would issue to the Project Developer and list on the public registry.

51.     The Carbon Credit Registry publicly listed information provided to it by the Project Developer and VVBs about the Cookstove Projects, including project descriptions and methodology; the number of VCCs issued for a particular project; and reports relating to validating, verifying, and monitoring the Cookstove Projects.

52.     After the Project Developer provided such information (either to the Carbon Credit Registry or to the VVBs, who also reported such information to the Carbon Credit Registry), the Carbon Credit Registry issued millions of VCCs to the Project Developer relating to the Cookstove Projects.

53.     The Project Developer sold some of these VCCs, including to counterparties in the United States and other parts of the world.

**D.     <u>Carbon Credit Fraud</u>**

54.     During the Relevant Period, Newcombe and others at the Project Developer in coordination with him and at his direction, repeatedly provided and caused to be provided false, misleading, and inaccurate information to the Carbon Credit Registry and to VVBs for the purpose of presenting a misleading impression of the quality and results of the projects, and wrongfully increasing the number of VCCs a project would be issued.

55.     Newcombe as well as other Project Developer executives, supervisors, and personnel, controlled, directed, oversaw, and participated in these efforts.

56.     In particular, while CEO and majority shareholder, Newcombe knowingly, intentionally, or recklessly participated in, directed, and set the tone for the fraud in connection with the VCCs.

57.     Project Developer personnel, including Newcombe, discussed the scheme during in-person meetings, voice calls, and written communications such as emails and chat messages.

58.     At times, Project Developer personnel, including in communications with Newcombe, referred internally to the fraudulent falsification of data to be reported to the Carbon Credit Registry and VVBs euphemistically as "manag[ing]" the data.

59.     During the Relevant Period, with Newcombe's knowledge or at his direction, Project Developer personnel took steps to falsely and misleadingly alter survey results that served as inputs to the calculation of VCCs for the Cookstove Projects.

60.     For example, one input used to calculate emissions reductions (and thus VCCs) was the number of installed cookstoves that in fact were in place and operational during a given period of time (e.g., during a monitoring period).  To obtain this input, Project Developer personnel typically surveyed a small number of households where stoves had been installed and then extrapolated from those survey results.

61.     At times, Project Developer personnel performing Cookstove Project surveys found households where previously installed stoves were no longer in place or were not operational.

62.    Accurately reporting these results would tend to reduce the amount of VCCs issued for a project.  A broken, missing, or unused stove does not reduce emissions versus the baseline scenario.

63.    Instead of accurately reporting such results, Project Developer personnel took steps to falsely and misleadingly increase the reported number of cookstoves in place and operational during various survey periods.

64.    For example, Project Developer personnel rebuilt missing or broken stoves and then falsely reported the stoves as having been in place and operational for the entirety of a given period of time or omitted unfavorable results from a survey entirely.

65.    The Project Developer also arranged with a local agent to falsify survey results concerning cookstove usage and efficiency.

66.    During the Relevant Period, Newcombe knew of and understood these efforts to achieve falsely and misleadingly favorable survey results.

67.    During the Relevant Period, these false and misleading survey results were routinely reported to the Carbon Credit Registry in connection with the Cookstove Projects.

68.    During the Relevant Period, under Newcombe's direction and with his knowledge, Project Developer personnel also prepared false and misleading information to report to the Carbon Credit Registry by falsely and misleadingly altering data relating to the Cookstove Projects after the data had been gathered.

69.    For example, in or around September 2022, the Project Developer prepared information to be provided to the Carbon Credit Registry for listing and verification of a Cookstove Project.

70.     As part of this process, Project Developer personnel performed surveys to gather inputs pursuant to the methodology to calculate the amount of estimated greenhouse-gas reductions.

71.     The information the Project Developer personnel gathered resulted in a low amount of estimated greenhouse-gas reductions.

72.     This low result would have resulted in fewer VCCs being issued for the project, and therefore less potential revenue.

73.     Upon learning the actual result of estimated greenhouse-gas reductions calculated pursuant to the project's methodology, Newcombe told certain Project Developer personnel he would have liked to see a higher, more-favorable output for the project.

74.     Newcombe then communicated to one of those Project Developer personnel a higher target figure of VCCs per household for the project.

75.     More VCCs being issued for the project would result in more potential revenue.

76.     The Project Developer employee notified Newcombe that the data would have to be altered to meet that goal.

77.     Project Developer personnel then falsely and misleadingly altered the project's survey data in order to result in a higher, more-favorable calculation of greenhouse-gas reductions.

78.     A Project Developer employee then reported back to Newcombe to confirm that the falsified result was sufficiently favorable.

79.     In response, Newcome confirmed that the false and misleading result was sufficient for the desired outcome (of more VCCs being issued for the project).

80.     Project Developer personnel then reported this false and misleading information to the Carbon Credit Registry.

81.     After receiving the false and misleading information, the Carbon Credit Registry issued VCCs to the Project Developer in connection with the project.

82.     Thereafter, in or around November 2023, in connection with this project, Newcombe signed a representation attesting to the truth and accuracy of the information the Project Developer reported to the Carbon Credit Registry for that project.

83.     That representation was a lie.

84.     Despite his involvement in the scheme, Newcombe signed numerous written representations in connection with the Cookstove Projects that the information submitted by the Project Developer concerning its projects was accurate.

85.     For example, in or around November 2023, Newcombe signed, and the Project Developer submitted, a written representation that the information provided in connection with one of the Cookstove Projects was, "to the best of [his] knowledge and after due inquiry, true, accurate, and complete in all material respects."

86.     This was false.  In truth, as Newcombe well knew, the information that the Project Developer had submitted for that project included false and misleading data (such as data relating to cookstove usage or efficiency) intended to increase the VCCs that would be issued by the Carbon Credit Registry for the project.

87.     Towards the end of the Relevant Period, when others at the Project Developer became aware of the fraud and brought it to Newcombe's attention, he took steps to deny or minimize his involvement in the scheme and to provide pretextual explanations for the fraud.

88.     During the Relevant Period, the Carbon Credit Registry received numerous false and misleading reports from the Project Developer in connection with potentially dozens of projects and then publicly reported such information on its website and issued to the Project Developer millions more VCCs than the Project Developer was entitled to receive.

## VI.    VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS

### COUNT I

**Manipulative or Deceptive Device or Contrivance in Violation of Section 6(c)(1) of the Act and Regulation 180.1(a)(1)–(3)**

89.     The allegations set forth in paragraphs 1 through 88 are re-alleged and incorporated herein by reference.

90.     Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), states:

> It shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after July 21, 2010, provided no rule or regulation promulgated by the Commission shall require any person to disclose to another person nonpublic information that may be material to the market price, rate, or level of the commodity transaction, except as necessary to make any statement made to the other person in or in connection with the transaction not misleading in any material respect.

91.     Section 6(c)(1) of the Act, 7 U.S.C. § 9, and Regulation 180.1, 17 C.F.R. § 180.1 (2023), prohibit the use or attempted use of any manipulative or deceptive device, untrue or misleading statements or omissions, or deceptive practice, in connection with any swap or contract of sale of any commodity in interstate commerce, or for future delivery. Regulation 180.1(a)(1)–(3) provides in relevant part:

It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:

(1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;

(2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;

(3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person; . . .

92.     During the Relevant Period, Newcombe violated Section 6(c)(1) of the Act and Regulation 180.1(a)(1)–(3), among other things, by, directly or indirectly, intentionally or recklessly engaging in fraud in connection with contracts of sale of VCCs, a commodity in interstate commerce.

93.     Newcombe's fraudulent conduct included, among other things, directly or indirectly, intentionally or recklessly reporting and causing to be reported false or misleading information, including data, regarding the use of, and energy saved by, the Project Developer's projects to the Carbon Credit Registry, VVBs, and others.

94.     Newcombe, in coordination with others at the Project Developer, engaged in this fraudulent conduct for the purpose of misrepresenting the quality of its Cookstove Projects and increasing the number of VCCs issued to the Project Developer for those projects under the relevant methodologies.

95.     The fraud by Newcombe and others in concert with him resulted in the Project Developer obtaining significantly more carbon credits than the Project Developer was entitled to.

96.     The Project Developer could and did sell deceptively obtained VCCs for revenue.

97.     Newcombe engaged in the acts and practices described above willfully, intentionally, or recklessly.

98.     By this conduct, Newcombe violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3).

99.     During the Relevant Period, Newcombe directly or indirectly controlled the Project Developer, its affiliated corporations, and other persons.  Newcombe did not act in good faith or knowingly induced, directly or indirectly, the violations alleged in this Count and is thus liable as a control person for the violations pursuant to 7 U.S.C. § 13c(b).

100.    The acts and omissions by Newcombe and other Project Developer officers, employees, or agents acting for the Project Developer described herein were done within the scope of their office, employment, or agency with the Project Developer.  Therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2023), the Project Developer is liable as a principal for each act, omission, or failure of the officers, employees, or agents acting for the Project Developer.

101.    During the Relevant Period, Newcombe willfully aided, abetted, counseled, commanded, induced, or procured the acts constituting violations by the Project Developer or its officers, employees, and agents described herein, or acted in combination or concert with other persons in any such violation, or willfully caused an act to be done or omitted which if directly performed or omitted by Newcombe or another would constitute a violation of Section 6(c)(1) of the Act and Regulation 180.1(a)(1)–(3) described herein.  Pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a), Newcombe is therefore liable for the violations described herein to the same extent as those who committed the violations.

102.    Each fraudulent or deceptive act, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3).

## COUNT II

### False, Misleading, or Inaccurate Reports in Violation of Sections 6(c)(1)(A) and 9(a)(2) of the Act, and Regulation 180.1(a)(4)

103.    Paragraphs 1 through 88 of this Complaint are re-alleged and incorporated herein by reference.

104.    Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2), in relevant part, makes it unlawful for any person "knowingly to deliver or cause to be delivered for transmission through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce . . . ."

105.    Section 6(c)(1)(A) of the Act, 7 U.S.C. § 9(1)(A), and Regulation 180.1(a)(4), 17 C.F.R. § 180.1(a)(4) (2023), similarly prohibit intentionally or recklessly making false or misleading reports of market information.  Specifically, Regulation 180.1(a)(4) provides in relevant part:

> It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:
>
> . . .
>
> (4) Deliver or cause to be delivered, or attempt to deliver or cause to be delivered, for transmission through the mails or interstate commerce, by any means of communication whatsoever, a false or misleading or inaccurate report concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce, knowing, or acting in reckless disregard of the fact that such report is false, misleading or

inaccurate. Notwithstanding the foregoing, no violation of this subsection shall exist where the person mistakenly transmits, in good faith, false or misleading or inaccurate information to a price reporting service.

106.    Newcombe violated Sections 6(c)(1)(A) and 9(a)(2) of the Act and Regulation 180.1(a)(4) by directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce (such as VCCs), or contract for future delivery on or subject to the rules of any registered entity, directly or indirectly, knowingly, and intentionally or recklessly, delivering or causing to be delivered, for transmission through the mails or interstate commerce, by any means of communication whatsoever, false or misleading or inaccurate reports concerning the relevant projects' performance and compliance with the purported methodologies, validation processes, and verification processes; and relating to the quality and supply of the VCCs relating to those projects.

107.    Newcombe, directly or indirectly, in coordination with other Project Developer personnel, caused the Project Developer to submit the reports to the Carbon Credit Registry, a registry that verified and reported quantities and aspects of the VCCs and their related projects to the public on its website; to VVBs; and to market participants.

108.    The reports were false, misleading, or knowingly inaccurate.

109.    The reports from the Project Developer to the Carbon Credit Registry, and the Caron Credit Registry's reports to the public on its website, concerned the projects' quality and supply of the VCCs relating to those projects.  Information concerning the quality and supply of VCCs is market information that affects or tends to affect the price of VCCs, a commodity in interstate commerce.

110.    Newcombe, as well as others at the Project Developer, knew and acted in reckless disregard of the fact that the reports were false, misleading, or inaccurate.

111.    Newcombe as well as others at the Project Developer engaged in the acts and practices described above knowingly and intentionally or recklessly.

112.    By this conduct, Newcombe violated Sections 6(c)(1)(A) and 9(a)(2) of the Act and Regulation 180.1(a)(4).

113.    During the Relevant Period, Newcombe directly or indirectly controlled the Project Developer, and its employees, officers, and agents, and did not act in good faith or knowingly induced, directly or indirectly, their violations alleged herein, and is thus liable as a control person for those violations pursuant to 7 U.S.C. § 13c(b).

114.    The acts and omissions by Newcombe and other officers, employees, or agents of the Project Developer described herein were done within the scope of their office, employment, or agency with the Project Developer.  Therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2023), the Project Developer is liable as a principal for each act, omission, or failure of the officers, employees, or agents acting for the Project Developer.

115.    During the Relevant Period, Newcombe willfully aided, abetted, counseled, commanded, induced, or procured the acts constituting the violations described herein, or acted in combination or concert with other persons in any such violation, or willfully caused an act to be done or omitted which if directly performed or omitted by Newcombe or another would constitute a violation of Sections 6(c)(1)(A) and 9(a)(2) of the Act, and Regulation 180.1(a)(4) described herein.  Pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a), Newcombe is therefore liable for the violations described herein to the same extent as those who committed them.

116.    Each act in violation of Sections 6(c)(1)(A) and 9(a)(2) of the Act, and Regulation 180.1(a)(4), including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation.

## VII.    RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-l, and pursuant to the Court's own equitable powers, enter:

A.    An order finding that Defendant Newcombe violated Sections 6(c)(1), 6(c)(1)(A), and 9(a)(2) of the Act, 7 U.S.C. §§ 9(1), 9(1)(A), 13(a)(2), and Regulation 180.1(a)(1)–(4), 17 C.F.R. § 180.1(a)(1)–(4) (2023).

B.    An order of permanent injunction enjoining Newcombe, and his affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with him, who receive actual notice of such order by personal service or otherwise, from engaging in the conduct described above, in violation of Sections 6(c)(1), 6(c)(1)(A), and 9(a)(2) of the Act, 7 U.S.C. §§ 9(1), 9(1)(A), 13(a)(2), and Regulation 180.1(a)(1)–(4), 17 C.F.R. § 180.1(a)(1)–(4) (2023).

C.    An order of permanent injunction restraining and enjoining Newcombe and any of his affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert or participation with Defendant, from directly or indirectly:

      (i)    trading on or subject to the rules of any registered entity (as that term is defined in Section 1a of the Act, 7 U.S.C. § 1a(40));

      (ii)    entering into any transactions involving "commodity interests" (as that term is defined in Commission Regulation 1.3, 17 C.F.R. § 1.3 (2023)) for accounts held in the name of Defendant or for accounts in which Defendant has a direct

or indirect interest;

(iii)   having any commodity interests traded on Defendant's behalf;

(iv)   controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

(v)   soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

(vi)   applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2023); and

(vii)   acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2023)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9);

D.   An order directing Newcombe, as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedures as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act and Regulations described herein, including pre-judgment and post-judgment interest;

E.   An order requiring Newcombe, as well as any successors thereof, to make full restitution to every person who has sustained losses proximately caused by the violations described herein, including pre-judgment and post-judgment interest;

F.      An order directing Newcombe and any of his successors, to rescind, pursuant to

such procedures as the Court may order, all contracts and agreements, whether implied or

express, entered into between, with or among Newcombe and any of the clients whose funds

were received by him as a result of the acts and practices which constituted violations of the Act

and Regulations as described herein;

G.      An order requiring Newcombe to pay a civil monetary penalty under the Act, to be

assessed by the Court, in an amount not to exceed the penalty described by Section 6c(d)(1) of

the Act, 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties

Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, tit. VII, § 701, 129 Stat.

584, 599–600, see Regulation 143.8, 17 C.F.R. § 143.8 (2023), as amended 89 Fed. Reg. 4544

(Jan. 24, 2024), for each violation of the Act and Regulations, as described herein;

H.      An order requiring Newcombe to pay costs and fees as permitted by

28 U.S.C. §§ 1920 and 2412(a)(2); and

I.      An order providing such other and further relief as the Court deems proper.

*      *      *

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a jury trial on all triable issues.

Dated:  October 2, 2024                    Respectfully submitted,

**ATTORNEYS FOR PLAINTIFF**

**COMMODITY FUTURES**
**TRADING COMMISSION**

Manal M. Sultan
Deputy Director
Commodity Futures Trading Commission
Division of Enforcement

By: */s/    Jonathan G. Coppola*
Jonathan G. Coppola, Trial Attorney
Nicole Buseman, Trial Attorney
Meredith Borner, Trial Attorney
Gates S. Hurand, Chief Trial Attorney
R. Stephen Painter, Jr., Chief Trial Attorney (*pro hac vice* admission application to be filed)

COMMODITY FUTURES
TRADING COMMISSION
Ted Weiss Federal Office Building
290 Broadway, 6th Floor
New York, NY 10007
Phone: (646) 746-9700
Fax: (646) 746-9938
jcoppola@cftc.gov
nbuseman@cftc.gov
mborner@cftc.gov
ghurand@cftc.gov
spainter@cftc.gov